# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**EDWARD E. GILLEN CO.,**

        Plaintiff,

        **-vs-**

**THE INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA and
LEXINGTON INSURANCE COMPANY,**

        Defendants,

        **-vs-**

**LIBERTY MUTUAL INSURANCE COMPANY,**

        Intervenor-Defendant.

**Case No. 10-C-564**

---

# DECISION AND ORDER

---

This multi-layered insurance coverage dispute relates to the construction of a school building for the Latin School of Chicago. The plaintiff, Edward E. Gillen Company ("Gillen"), was hired to design and install an earth retention system to stabilize the ground for construction. On May 2, 2006, an adjacent property owner sustained damage, and the project was delayed, ultimately resulting in an adverse arbitration award against Gillen in excess of $2 million dollars. Gillen's primary liability insurer, Liberty Mutual Insurance Company ("Liberty Mutual"), paid its policy limit of one million dollars. Gillen's excess liability insurer, The Insurance Company of the State of Pennsylvania ("ICSOP"), refuses to pay any amount of the award.

Gillen seeks declaratory relief that it is entitled to indemnification for the balance of the arbitration award from ICSOP.[1] Gillen also alleges claims against ICSOP for bad faith and breach of contract. ICSOP moves to dismiss, arguing that most of the arbitration award represents economic loss which is not covered either by Liberty Mutual's policy or by ICSOP's "follow-form" policy, both of which are standard Commercial General Liability ("CGL") policies. Indeed, ICSOP argues that less than half of Liberty Mutual's $1 million payment actually applies towards Liberty Mutual's policy limit. After initially being dropped from this lawsuit, Liberty Mutual intervened and moved for summary judgment, requesting a declaration that it exhausted its policy limits and that it owes no further duty to defend or indemnify Gillen in relation to any claims arising out of the underlying incident.

## BACKGROUND

On or about February 3, 2006, The Meyne Company, a general contractor and division of Bulley & Andrews, LLC, entered into an agreement with the Latin School of Chicago for the demolition of an existing structure and the construction of a new school building. Meyne subsequently hired Gillen to design and install an earth retention system ("ERS") for the project. The purpose of an ERS is to stabilize the ground to enable the construction of the project to be undertaken and minimize the risk to adjacent properties.

On or about May 1, 2006, the Korndorf Home, which is located adjacent to the Project site, sustained damage, allegedly due to work on the Project. As a direct result, work on the

---

[1] Gillen also brought claims against its surplus lines insurer, Lexington Insurance Company. On November 2, 2010, the Court issued an order enjoining Lexington from pursuing arbitration proceedings against Gillen. *Gillen v. Ins. Co. of the State of Penn.*, 747 F. Supp. 2d 1058 (E.D. Wis. 2010). Lexington's appeal of that ruling is currently pending in the Seventh Circuit.

south end of the Project was stopped to determine how to prevent further damage to the Korndorf Home, resulting in delays to the Project. As a result of these events, Meyne asserted claims and, ultimately, instituted arbitration proceedings against Gillen to recover for damages to the adjacent Korndorf property and resulting project delays. Gillen tendered Meyne's claims to Liberty Mutual (the primary insurer) and ICSOP (the excess insurer). Liberty Mutual provided Gillen with a defense. ICSOP did not.

On May 17, 2010, the arbitration panel issued an adverse award against Gillen. The arbitration panel found that, on May 1, 2006, the Gillen crew was installing sheet piling near the Korndorf Home front steps, using a multiplier, when the alarm on one of the vibration monitors went off and work was stopped. Gillen restarted work three times, using different installation methods, but stopped work each time when alarms continued to go off. The Korndorfs reported damage to their home the next day, on May 2, 2006, and no further ERS installation work was undertaken. The arbitration panel found: "It was not until the Fall of 2006 that the various parties, including the Korndorfs, agreed on an underpinning method to stabilize the Korndorf Home. That work was done around August, 2006 and the Project resumed, although the original schedule was severely impacted."

According to the arbitration panel, "the damage to the Korndorf Home was caused by the negligent installation of sheet piling by Gillen, using methods that caused densification of the soil beneath the Korndorf's foundation and resulted in settlement." The panel similarly found that "Gillen breached its contract by failing to use proper methods to install an ERS for the project. As a result, Meyne has been damaged. . . ." The panel awarded

-3-

Case 2:10-cv-00564-RTR   Filed 05/03/11   Page 3 of 13   Document 87

Meyne a net amount of $1,783,328.47, following a set off of $380,040.61 for amounts owed Gillen by Meyne. An Illinois state court later vacated the $380,040.61 offset, resulting in a total adverse award of $2,163,369.08.

Gillen repeatedly demanded that Liberty Mutual indemnify it for the arbitration award, asserting, among other things, that the Meyne Arbitration claims all flow directly from physical injury to tangible property as well as for loss of use of tangible property that was not physically injured and that such injuries are covered "property" damage under Liberty Mutual's policy. Gillen also asserted that Liberty Mutual had waived any coverage defenses to the Meyne Arbitration claims. On or about June 9, 2010, Liberty Mutual agreed to pay its per occurrence policy limits of $1 million and has since paid those limits to Meyne, in partial satisfaction of the arbitration award.

ICSOP denied any defense or indemnity obligations in relation to the arbitration award and, accordingly, has paid no amounts in satisfaction of that award under its policy. In light of ICSOP's denial, and its assertion that Liberty Mutual did not exhaust its coverage obligations, Gillen re-tendered Gillen's continued defense of the Meyne arbitration on appeal, including payment of a supersedeas bond, which Liberty Mutual accepted under reservation of rights.

Shortly after Liberty Mutual's indemnity payment, the Korndorfs commenced an action against the Latin School, Meyne, Bulley & Andrews, and Gillen in the Circuit Court of Cook County, Illinois. The Korndorfs sought to recover in excess of $500,000 in damages arising from the underlying incident which damaged their property. Gillen tendered defense

and indemnity of the Korndorf Lawsuit to Liberty Mutual and ICSOP. Liberty Mutual determined after investigation that its policies did not and do not provide defense or indemnity coverage to Gillen for the claims and damages alleged in the Korndorf Lawsuit primarily because Liberty Mutual had exhausted its applicable limits when it paid $1 million in partial satisfaction of the arbitration award. Nonetheless, Liberty Mutual accepted Gillen's tender, under reservation of rights, including the right upon a determination of no coverage to seek repayment of any amounts paid in providing a defense to Gillen. ICSOP denied Gillen's tender, asserting, among other things, that approximately $524,000 of amounts paid by Liberty Mutual in partial satisfaction of the arbitration award relate to uncovered economic losses; Liberty Mutual, therefore, had not exhausted its applicable limits of liability; and any defense and indemnity obligations for the Korndorf Lawsuit rested first with Liberty Mutual, not ICSOP. The Korndorfs have since withdrawn and dismissed their lawsuit, without prejudice to re-filing.

**LIBERTY MUTUAL'S MOTION FOR SUMMARY JUDGMENT**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is appropriate only if, on the record as a

-5-

whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

Under Wisconsin law,[2] liability insurance policies impose "two duties with respect to the insured – the duty to indemnify and the duty to defend." *Gross v. Lloyds of London Ins. Co.*, 358 N.W.2d 266, 269 (Wis. 1984). Liberty Mutual seeks a declaration that these duties were extinguished when it paid its policy limit – $1 million per occurrence – towards the $2.1 million arbitration award entered against Gillen.[3] ICSOP argues that only $476,187.27 of the arbitration award (for damage to the Korndorfs' home) is covered by the Liberty Mutual Policy. ICSOP further argues that the balance of the award relates to damages arising from project delay, pure "economic loss" that is uncovered by a standard CGL policy. *Bulen v. West Bend Mut. Ins. Co.*, 371 N.W.2d 392 (Wis. Ct. App. 1985). Setting aside the merits of ICSOP's coverage argument for the time being, ICSOP cannot challenge or undermine Liberty Mutual's decision to pay out its coverage limits simply because ICSOP is a follow-form excess liability insurer.

In *Loy v. Bunderson*, 320 N.W.2d 175 (Wis. 1982), the Wisconsin Supreme Court considered a scenario where a primary insurer settled claims against the insured for less than its policy limit, leaving an excess insurer liable for any sums above the primary policy limit and up to the limits of the excess policy. The court upheld this procedure:

> In the instant case, General Casualty [the primary insurer] fully discharged its duty to its own insured. It settled the claim of the

---

[2] The parties agree that Wisconsin law governs in this diversity case.

[3] Liberty Mutual's policy has a $1 million "per occurrence" limit and a $2 million aggregate limit.

-6-

> plaintiff as against it within the policy limits and, by its
> negotiations with the claimant, guaranteed the protection of the
> insured from any personal liability for a claim in excess of
> General Casualty's limits. It also afforded Travelers [the excess
> insurer] the maximum protection consistent with General
> Casualty's obligation and consistent with the 'other insurance'
> provisions of Travelers' policy. By its settlement it protected
> Travelers from any possibility of liability up to $50,000. This
> is the most that General Casualty was obligated to do, and it is
> all that Travelers' 'other insurance' provision can require.

320 N.W.2d at 191. The excess carrier in *Loy* was "not a true excess carrier, because the policy was not written under circumstances where rates were ascertained after giving due consideration to known existing and underlying basic or primary policies." *Id.* at 179.[4] In a later case, the court emphasized that its approval of the release in *Loy* was not "anchored to the issue of whether a true primary/excess insurance situation exists. The desirability of *Loy*-type agreements lies in the encouragement of partial settlements in future cases, thereby fostering effective and expeditious resolution of lawsuits. Partial settlements not only benefit the parties involved, but the justice system as a whole. Further, we reemphasize that 'public interest requires that a plaintiff be permitted to settle claims against some of the exposed parties without releasing others.'" *Teigen v. Jelco of Wis., Inc.*, 367 N.W.2d 806, 810 (Wis. 1985) (internal citation omitted).

ICSOP argues that the *Loy* procedure is distinguishable because Gillen did not enter into a formal agreement which settled Meyne's claims against Gillen and released Liberty

---

[4] In other words, the "fact of excess coverage" was a "mere coincidence." The insured "contracted for his own insurance with General Casualty with limits to $50,000, while [the insured's employer] separately contracted with Travelers for coverage with limits of $500,000. It is only because of the recital in Travelers' policy that its coverage is claimed to be excess over the limits afforded by the General Casualty policy." *Loy* at 179.

-7-

Mutual from any further liability. This is surely a distinction without a meaningful difference. Just like the primary policy in *Teigen*, Liberty Mutual's policy has a per-occurrence limit, and the duty to defend ends when Liberty Mutual has "used up the applicable limit of insurance in the payment of judgments or settlements. . . ." Liberty Mutual's Proposed Finding of Fact, ¶ 34; *Teigen* at 810 ("Rural's policy provides that it shall have the right and duty to defend any suit against Jelco but it shall not be obligated 'to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements'"). The effect of paying the entire per-occurrence limit is the same as a settlement and release: Liberty Mutual "has discharged *in toto* its obligation to its insured." *Teigen* at 810; *St. John's Home of Milwaukee v. Cont'l Cas. Co.*, 434 N.W.2d 112, 120 (Wis. Ct. App. 1988) ("when an insurer exhausts its liability by judgment or settlement, it discharges its obligation to the insured *in toto*").

ICSOP cites non-Wisconsin cases for the proposition that it can challenge Liberty Mutual's coverage position. *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's*, 871 N.E.2d 418 (Mass. 2007); *Keystone Shipping Co. v. Home Ins. Co.*, 840 F.2d 181 (3d Cir. 1988). ICSOP misconstrues the nature of these cases. For example, in *Allmerica*, the Supreme Judicial Court of Massachusetts held that a follow-form excess liability insurer was not bound by the primary insurer's decision to settle the insured's claim for indemnification against a class action lawsuit. "An excess carrier's intent to incorporate the same words used in a separate agreement between the primary insurer and the insured does not imply an intent by the excess carrier to accept decisions made by the primary carrier about the extent of its

obligations under its own agreement. By adopting the form of words used by [the primary insurer], the underwriters did not also cede to it the right to make decisions about the underwriters' obligation to perform in various circumstances. To conclude otherwise would undermine the distinct and separate nature of each insurer's contract with Allmerica." 871 N.E.2d at 428. Similarly, in *Keystone Shipping*, the Third Circuit held that an excess liability insurer "is not obliged to accept *other co-insurers evaluations* of litigating prospects so long as its *own evaluation* is not unreasonably low and it has acted in good faith in advancing and adhering to that evaluation in the absence of a contract which can be construed to impose such an obligation." 840 F.2d at 182-83 (emphases added).

*Allmerica* and *Keystone Shipping* do not stand for the proposition, advanced by ICSOP, that an excess insurer may question the validity of a primary insurer's coverage position. Instead, these cases merely hold that a follow-form excess insurer is not *required* to adjust a claim in the same manner as the primary insurer. Here, ICSOP is not bound by Liberty Mutual's coverage decision. ICSOP is free, as it has already done, to contest coverage under its own policy. But an excess liability insurer cannot avoid or reduce liability under its own policy by challenging a separate insurer's decision to settle or pay out claims at a prior layer of insurance. In the absence of a specific contractual arrangement, the primary insurer owes no duty to the excess insurer with respect to claims "within the parameters of excess carrier's coverage." *Teigen* at 811. An excess liability insurer, particularly a "follow-form" insurer, assumes the risk that the primary insurer will adjust claims in a certain manner and in such a way that triggers the potential for liability (and the

duty to defend) under the excess policy. "An insurance program involving a primary policy and one or more excess policies divides risk into distinct units and insures each unit individually. The individual insurers do not (absent a specific provision) act as coinsurers of the entirety of the risk. Rather, each insurer contracts with the insured individually to cover a particular portion of the risk." *Allmerica* at 426.[5]

ICSOP's position is that Liberty Mutual must fight to the death to contest coverage. This is contrary to the law in Wisconsin, which seeks to promote the settlement of claims without resort to costly litigation. For all of the foregoing reasons, ICSOP, as an excess insurer, may not challenge Liberty Mutual's coverage determination as a primary insurer.

## ICSOP'S MOTION TO DISMISS

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Ultimately, a defendant is owed "fair notice of what the . . . claim is and the grounds upon which it rests."

---

[5] ICSOP also cites *Serv. Corp. Int'l v. Great Am. Ins. Co.*, 264 Fed. Appx. 431 (5th Cir. 2008). The excess policy in this case included terminology that liability was not triggered unless primary liability was completely exhausted. It did not allow an excess insurer to question the manner in which the primary insurer settled claims against the primary policy. "Chubb's rights are not at stake. No one is questioning Chubb's business decision to settle for $25 million or arguing that Chubb should be held responsible for an unwise settlement decision." 264 Fed. Appx. at 435.

*Conley v. Gibson*, 355 U.S. 41, 47 (1957). "Our system operates on a notice pleading standard; *Twombly* and its progeny do not change this fact." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009); *Smith v. Duffey*, 576 F.3d 336, 339-40 (7th Cir. 2009) (noting courts' over reliance on *Twombly*).

As noted, ICSOP relies upon the economic loss doctrine, which generally precludes recovery in tort for economic losses resulting from the failure of a product to live up to contractual expectations. *Wausau Tile, Inc. v. Cty. Concrete Corp.*, 593 N.W.2d 445, 451 (Wis. 1999). ICSOP argues that a standard CGL policy does not provide coverage for purely economic loss such as damages caused by delay in contract performance. *Bulen, supra*; *Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 607 N.W.2d 276 (Wis. 2000). But ICSOP's argument does not rely upon any actual policy language. "The economic loss doctrine is a remedies principle. It determines how a loss can be recovered – in tort or in contract/warranty law. *It does not determine whether an insurance policy covers a claim, which depends instead upon the policy language*." *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 75 (Wis. 2004) (emphasis added). Even though "CGL policies generally do not cover contract claims arising out of the insured's defective work or product, . . . this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage. This distinction is sometimes overlooked, and has resulted in some regrettably overbroad generalizations about CGL policies in our case law." *Id.* at 76 (discussing *Bulen*). Accordingly, the Court declines the invitation to dismiss Gillen's

-11-

complaint without an analysis of the actual terms of the CGL policy issued by ICSOP. Gillen states an actionable claim for relief that the entire arbitration award is covered under the policy.

ICSOP also moves to dismiss Gillen's bad faith claim. In Wisconsin, an insured can bring a bad faith action against an insurance company for failing to settle a claim with a third-party claimant when the ultimate judgment exposes the insured to a judgment in excess of the policy limits. *A.W. Huss Co. v. Cont'l Cas. Co.*, 735 F.2d 246, 249 (7th Cir. 1984) (citing *Kranzush v. Badger State Mu. Cas. Co.*, 307 N.W.2d 256 (Wis. 1981)). The arbitration award is easily within ICSOP's policy limit – $10 million in excess of Liberty Mutual's policy. Gillen relies upon a recent holding by the Wisconsin Supreme Court which allowed a bad faith claim when the insurance company "exercised control over the settlement of a third-party claim . . . and the verdict in the underlying liability case imposed personal liability . . . within the policy limits." *Roehl Transport, Inc. v. Lib. Mut. Ins. Co.*, 784 N.W.2d 542, 564 (Wis. 2010). However, the basis for the holding in *Roehl* was that the policyholder had a large deductible ($500,000), and the insured was exposed to liability within the amount of that deductible. "Roehl Transport's interest is in settling the claim for as little as possible below $500,000. [The insurance company], on the other hand, has little concern with the value of a claim settled below $500,000; its financial interest is in minimizing its costs in investigating and adjusting the claim and in keeping the settlement amount below $500,000. The interests of [the insurer] and Roehl Transport are in conflict regarding payment of a claim below the sum of $500,000." *Id.* at 557-58. Such is obviously

-12-

not the case here, and a federal court sitting in diversity should not adopt expansive interpretations of state law. *Huss* at 253 (refusing to recognize a new type of bad faith claim under Wisconsin law because of the "limited discretion of a federal appellate court in a diversity case with respect to untested legal theories brought under the rubric of state law").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Liberty Mutual's motion for summary judgment [D. 69] is **GRANTED**; and

2. ICSOP's motion to dismiss [D. 21] is **GRANTED-IN-PART** and **DENIED-IN-PART**.

Dated at Milwaukee, Wisconsin, this 3rd day of May, 2011.

                                      **BY THE COURT:**

                                      *s/ Rudolph T. Randa*
                                      **HON. RUDOLPH T. RANDA**
                                      **U.S. District Judge**